

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-31-2006

# Mest v. Cabot Corp

Precedential or Non-Precedential: Precedential

Docket No. 04-4457

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Mest v. Cabot Corp" (2006). *2006 Decisions*. Paper 988.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/988

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-4457

———

MERRILL MEST; BETTY MEST; SUE HALLOWELL
(Individually and as Trustee of the Trust);
WAYNE HALLOWELL (Individually and as Trustee of the
Trust); SEAN HALLOWELL; AMBER HALLOWELL a minor,
by her next friend and parent, Wayne Hallowell); THE
HALLOWELL FARMS PARTNERSHIP; THE WAYNE Z.
HALLOWELL FAMILY REVOCABLE TRUST,

Appellants,

v.

CABOT CORPORATION;
CABOT PERFORMANCE MATERIALS,

Appellees.

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No.  01-cv-04943)
District Judge: Honorable Cynthia M. Rufe

———

Argued November 8, 2005
Before: ROTH, FUENTES, and GARTH, Circuit Judges.

(Opinion Filed May 31, 2006)

Gary A. Bryant (Argued)
Willcox & Savage, P.C.
One Commercial Place
1800 Bank of America Center
Norfolk, VA 23510

Michael C. Davis
Peter K. Killough
Carter Ledyard & Milburn LLP
1401 Eye Street, NW
Suite 300
Washington, DC 20005

ATTORNEYS FOR APPELLANTS

Neil S. Witkes (Argued)
Manko, Gold, Katcher & Fox LLP
401 City Avenue
Suite 500
Bala Cynwyd, PA 19004

ATTORNEY FOR APPELLEES

––––

OPINION OF THE COURT

––––

FUENTES, <u>Circuit Judge</u>.

Wayne and Suzanne Hallowell and Merrill and Betty Mest are dairy farmers whose cows suffered from various ailments over the course of twenty years before being diagnosed with fluorosis in 1999.[1]  Upon learning the cause of their cows' symptoms, the

_____

[1]Fluorosis is a disease caused by fluoride poisoning.  It can cause damage to cows in the form of mottled and blackened teeth,

Hallowells and the Mests sued Cabot Corporation and Cabot Performance Materials (collectively, "Cabot") alleging, among other things, that Cabot engaged in the systematic poisoning of their dairy cows and farmland over several decades. Specifically, they claim that the hydrogen fluoride Cabot released from a nearby factory poisoned the vegetation upon which their livestock fed, and that Cabot fraudulently misled the plaintiffs to believe that the emissions were harmless. The District Court, concluding that the plaintiffs failed to exercise reasonable diligence to discover the cause of their cows' symptoms, granted summary judgment dismissing all of the plaintiffs' claims stemming from conduct that occurred prior to November 10, 1998, as time-barred. The District Court also dismissed the plaintiffs' claims of fraud and negligence per se, and held that the plaintiffs were not entitled to damages for emotional distress. We conclude that, because there exists a material issue of fact as to whether the plaintiffs exercised reasonable diligence in determining the cause of their cows' symptoms, the plaintiffs' claims are not time-barred. Accordingly, we vacate in part, affirm in part, and remand for further proceedings.

## I. Facts

The Hallowells and the Mests, together with certain other plaintiffs, own and operate dairy farms (the "Hallowell farms" and the "Mest farm," respectively) in Boyertown, Pennsylvania. The plaintiffs' farms are located one to four miles from a facility (the "Cabot Facility") owned and operated by Cabot.[2]

As early as 1972, the Hallowells began to notice disturbing symptoms in their dairy cows. The cows were not producing milk as expected and suffered from a variety of physical problems for which the Hallowells could find no explanation. The Hallowells consulted dairy farm specialists, including their veterinarians,

teeth that fall out, poor and decreased milk production and conception rates, skeletal abnormalities, abortions, stillbirths, lameness, and death.

[2] On a motion for summary judgment we look at all facts in the light most favorable to the non-moving party. See Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003).

3

nutritionists, breeders, and an agricultural extension agent. Over the course of the next two decades, the Hallowells were given various pieces of advice from these experts, which they followed diligently. When Wayne Hallowell suspected radiation poisoning, he administered iodine to counteract it. The Hallowells altered the cows' nutritional program upon the advice of nutritionists. When they were advised that the problems might be chemical in nature, the Hallowells tested for several chemicals, although they did not initially test for fluoride. All the chemical tests came back negative. The Hallowells sent blood samples to experts at Michigan State University and were told that the results were normal. The Hallowells also installed a new air ventilation system and, after their veterinarian suggested that their cows' drinking water might be contaminated, they installed a new drinking water system. None of these efforts cured the cows of their ailments.

At some point during the 1970s, the Hallowells noticed a strange smell emanating from the Cabot Facility. (Joint Appendix ("JA") at 1508.) They telephoned the Cabot Facility to inquire into the smell and whether Cabot was releasing any harmful emissions. (Id.) The Hallowells allege that, during these calls, Cabot repeatedly asserted that any emissions from Cabot were harmless and could not hurt the Hallowells' dairy cows. (Id.) The Hallowells also allege that Cabot asserted that it carefully measured all emissions to ensure safety and compliance with the law.

In 1979, Hallowell contacted the Pennsylvania Department of Environmental Protection ("PADER") about the problems his cows were experiencing. Since 1976, PADER, together with Cabot, had been investigating the connection between fluoride emissions from the Cabot Facility and crop damage on farms adjacent to the Cabot Facility.[3] Between 1978 and 1983, Dr. Donald Davis ("Davis") of Penn State sampled forage crops on six dairy farms surrounding the Cabot facility, including one of the

---

[3]This was not Cabot's first study on the matter. During the 1960s, Cabot retained Dr. Robert H. Daines to study the possibility that emissions from the Cabot Facility could be causing fluoride damage to area crops. The study concluded the fluoride pollution was a mild problem. (Joint Appendix ("JA") at 192-94, 2342-49.) Cabot did not disclose the results of the study to area farmers.

4

Hallowell farms. On eight separate occasions during this period, PADER personnel and Davis took samples of the forage crops on one of the Hallowell farms. (JA at 632, 662.) Davis's resulting reports (the "Davis Reports"), published in the early 1980s, discuss the symptoms of fluorosis and note that fluorosis is "of serious concern to farmers located near sources of fluoride." (Supplemental Appendix ("SA") at 4-5.) The initial report identifies samples of leaves taken from the fence row of the Hallowell farms as having a higher fluoride concentration than those of the town area. (SA at 9-10, 22.) The report concludes, among other things, that the levels of fluoride "warrant[ed] consideration that the disease 'fluorosis' might occur in cattle fed the fluoride contaminated material." (SA at 4-5.) However, PADER did not inform Hallowell of the study or the Davis Reports.[4]

The Hallowells continued to enlist several experts in order to determine the cause of their cows' problems. In 1996, the Hallowells consulted Tim Fritz ("Fritz"), the County Extension Agent, in their investigation. Fritz contacted experts from the University of Pennsylvania New Bolton Center ("New Bolton") to evaluate the Hallowells' problem. After its investigation (the "New Bolton study"), New Bolton specifically ruled out fluoride as the cause of the cows' symptoms. (JA at 1512.) Although New Bolton could not determine the cause of the cows' illness, it suggested that the problem was most likely farm-specific, having to do with the mats in the cows' stalls. Hallowell responded by building a new barn with new mats in the stalls. In 1998, Hallowell enlisted the aid of the Environmental Protection Agency (the "EPA") which, after conducting tests, concluded that the problem was farm-specific and not environmental.

During the course of the New Bolton testing, Hallowell

---

[4]After the Davis Reports were submitted to PADER, Cabot requested that PADER keep the results of the reports confidential. (JA at 18, 182-83, 206, 213, 2242.) PADER refused the request. Although it did not release the Davis Reports to the farms neighboring the Cabot Facility, PADER's policy was that it would provide the reports to anyone who requested them. (JA at 1979-96, 2242.)

phoned Cabot for information about possible contaminants from the Cabot Facility. Hallowell asked Cabot if something might be wrong with his drinking water because of Cabot's activities. Cabot assured Hallowell that there was no danger with regard to his water. Hallowell also inquired into possible radiation danger, and again Cabot assured him there was no danger. Cabot admits that, during the course of the conversation, it may have assured Hallowell that there was no danger from the Cabot Facility's fluoride emissions, that they monitored their fluoride emissions closely to ensure they were at safe levels for crops and animals, and that the emissions were not in sufficient quantities to harm his cows. (JA at 448.)

Meanwhile, as early as 1980, Merrill Mest ("Mest") began noticing problems with his dairy cows, including mottled teeth, low milk production, an unusual number of aborted pregnancies, and breeding problems. (JA at 2171.) Mest consulted his veterinarian, agricultural extension agent, and nutritionist, some of whom concluded that bacteria in the cows' rumen were being killed but did not know why.[5] On the advice of their nutritionist, Dr. Carl Brown ("Brown"), the Mests tried nutritional solutions.

By 1982, the symptoms had not abated and no one had been able to provide the Mests with a definitive diagnosis. The Mests' agricultural extension agent and Brown suggested that fluoride might be the cause of the problems. Based on this advice, Mest hired experts from Pennsylvania State University ("Penn State"): Dr. Richard Adams ("Adams"), a nutritionist, and Dr. Larry Hutchinson ("Hutchinson"), a veterinarian. Brown, Adams, and Hutchinson discussed the possibility that fluoride might be the cause of the cows' symptoms, and decided to analyze feed samples for fluoride. The Penn State study analyzed the feed samples at two different laboratories and performed a fluoride analysis on bone ash from a calf on the Mest farm. As a result of their investigation, Adams and Hutchinson did not reach a definitive diagnosis, but did conclude that the Mests' cows did not suffer from fluorosis. (JA at 2172.) After informing Mest of this,

---

[5]The rumen is the first of four chambers in a cow's stomach. It contains various microbes that break down grass and hay, making it digestible.

6

however, Hutchinson sent Mest an additional letter dated January 5, 1983, reporting that the fluoride content of the bone ash sample was "at least marginally high" and recommending that fluoride "should be studied in any new outbreak of problems." (JA at 777.) Mest denies that he ever received this letter and, indeed, the copy of the letter in the record is not properly addressed to the Mests.[6] (JA at 143, 777, 2006, 2172.)

Over the course of the next decade, the Mests continued in vain to search for the cause of their cows' symptoms. Mest had weekly or monthly consultations with his nutritionist, veterinarian, and agricultural extension agent. He also routinely tested his cows for infections. On two separate occasions in the mid-1980s, Mest brought sick calves for evaluations at a state laboratory in Summerdale, Pennsylvania. In the late 1980s or early 1990s, Mest contacted PADER about his problems. He had his water and feed tested by PADER and the EPA, but the results were normal. None of these attempts yielded a definitive diagnosis.

In March 1999, Bill Smedley ("Smedley"), an environmental investigator for the nonprofit organization GreenWatch Inc. ("GreenWatch"), heard about the problems on the Mest and Hallowell farms and contacted the farmers. The Mests and the Hallowells agreed to pay GreenWatch to conduct a limited investigation. During the course of its investigation, GreenWatch reviewed PADER's files and obtained the Davis Reports. GreenWatch also retained the services of Dr. Lennart Krook ("Krook") of Cornell University. After conducting various tests on the cows, Krook diagnosed the Mests' cows and the Hallowells' cows with fluorosis, contracted by eating contaminated vegetation.

After this diagnosis, the parties entered into a Tolling/Standstill Agreement, under which the statute of limitations was tolled from December 31, 1999 until September 30, 2000. Less than one year later, on August 10, 2001, the plaintiffs brought this action against Cabot seeking damages arising from the alleged systematic poisoning of their dairy cows through fluoride emissions that contaminated the area's vegetation, and from the

_____

[6] The letter was addressed to "Rd 2, Keyser Rd., Schwenksville, PA," which was not the Mests' address. (JA at 143, 777.)

alleged fraudulent misrepresentations and omissions regarding the safety of Cabot's emissions. The plaintiffs also brought claims for trespass, nuisance, negligent interference with business, outrageous conduct, and negligence per se.

After the completion of discovery, the District Court granted summary judgment dismissing all of the plaintiffs' claims based on Cabot's activities prior to November 10, 1998, as barred by the two-year statute of limitations. Mest v. Cabot Corp., No. Civ.A.01-4943, 2004 WL 945131, at *10 (E.D. Pa. Apr. 29, 2004). In a subsequent opinion, the District Court also granted summary judgment with respect to the plaintiffs' fraud claims and claims for negligence per se, and held that the plaintiffs were not entitled to damages for emotional distress under Pennsylvania law. Mest v. Cabot Corp., No.Civ.A. 01-4943, 2004 WL 1102754, at *4-6 (E.D. Pa. May 14, 2004). The plaintiffs now appeal these rulings.

## II. Discussion

### A. Statute of Limitations

Because this is a diversity action, we look to Pennsylvania law to determine whether the District Court properly dismissed the plaintiffs' actions for failure to comply with the statute of limitations.[7] See Bohus v. Beloff, 950 F.2d 919, 924 (3d Cir. 1991). The statute of limitations for each of the claims alleged in the plaintiffs' Second Amended Complaint is two years. 42 Pa. Cons. Stat. Ann. § 5524. The two-year period begins as soon as the injury is sustained. Bohus, 950 F.2d at 924. "[L]ack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983).

Pursuant to this rule, the statute of limitations on the

---

[7]We exercise plenary review over the District Court's grant of summary judgment. See Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006). Our review must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

plaintiffs' claims began to accrue when the plaintiffs' cows contracted fluorosis. The Hallowells' cows began demonstrating symptoms as early as 1972, while the Mests' cows began demonstrating symptoms around 1980. The plaintiffs argue, however, that the statute of limitations should be tolled until their cows were actually diagnosed with the disease fluorosis by Krook in 1999. The plaintiffs cite two bases under Pennsylvania law for tolling the statute of limitations: 1) the discovery rule, and 2) Cabot's alleged fraudulent concealment. We address these arguments separately.

## 1. Tolling Pursuant to the Discovery Rule

### a. The Discovery Rule

The discovery rule is designed to "ameliorate the sometimes-harsh effects of the statute of limitations," and it is often applied in medical malpractice and latent disease cases in which the plaintiff is unable to discover his or her injury until several years after the tort occurred. Cathcart v. Keene Indus. Insulation, 471 A.2d 493, 500 (Pa. Super. 1984). The discovery rule tolls the accrual of the statute of limitations when a plaintiff is unable, "despite the exercise of due diligence, to know of the injury or its cause." Pocono Int'l Raceway, 468 A.2d at 471. Under the rule, even if a plaintiff suffers an injury, the statute of limitations does not begin to run until "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." Debiec v. Cabot Corp., 352 F.3d 117, 129 (3d Cir. 2003) (internal quotation marks and citation omitted). For the statute of limitations to run, a plaintiff need not know the "exact nature" of his injury, as long as it objectively appears that the plaintiff "is reasonably charged with the knowledge that he has an injury caused by another." Ackler v. Raymark Indus., Inc., 551 A.2d 291, 293 (Pa. Super. 1988).

As we have explained, the discovery rule focuses not on "the plaintiff's actual knowledge, but rather on 'whether the knowledge was known, or through the exercise of diligence, knowable to'" the plaintiff. Bohus, 950 F.2d at 925 (quoting O'Brien v. Eli Lilly & Co., 668 F.2d 704, 711 (3d Cir. 1981)). A plaintiff therefore is obligated "to exercise reasonable diligence in ascertaining the existence of the injury and its cause." Id. (internal quotation marks omitted). As soon as the plaintiff either has

9

discovered or, exercising reasonable diligence, should have discovered the injury and its cause, the statute of limitations begins to run. Id. Moreover, the plaintiff attempting to apply the discovery rule bears the burden of demonstrating that he exercised reasonable diligence in determining the existence and cause of his injury. Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995). To demonstrate reasonable diligence, a plaintiff must "establish[] that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." Id. at 250 (internal quotation marks and citations omitted).

The plaintiffs argue that the statute of limitations should be tolled by the discovery rule because they were unable to discover the cause of their injury until 1999 despite their exercise of reasonable diligence. The plaintiffs concede that they were aware of their injuries more than two years prior to the date they brought their claims. However, the plaintiffs argue that, despite their exercise of reasonable diligence, they were unable to ascertain the cause of their cows' symptoms until 1999, and therefore were unable to determine who caused their injuries. The plaintiffs argue that under the discovery rule the statute of limitations was therefore tolled until 1999, when Dr. Krook rendered his diagnosis that their cows suffered from fluorosis.

To support their argument, the plaintiffs cite Debiec, 352 F.3d at 120-23, in which we addressed when the statute of limitations begins to run for a plaintiff that has a disease that has been misdiagnosed. In Debiec, Jane Debiec ("Debiec") had allegedly died of berylliosis caused by exposure to beryllium from the defendants' plant. Id. at 120-21. When Debiec, suspecting beryllium as the cause of her illness, consulted a doctor about her symptoms, her doctor told her that beryllium was probably not to blame and diagnosed her with another illness. Id. at 121-23. The defendants argued that Debiec's reliance on her doctor's misdiagnosis, despite her suspicions to the contrary, did not constitute reasonable diligence as a matter of law. We agreed with the defendants that a definitive diagnosis of a plaintiff's injury is not necessary for the statute of limitations to start running. Id. at 132. We determined, however, that a definitive diagnosis that a plaintiff does not have a particular disease, and thus that the

10

defendant is not the cause of her injury, may be sufficient in some cases to overcome the plaintiff's suspicions that she has a particular injury. Id. In other words, a negative diagnosis may lead the plaintiff to reasonably believe that she does not have an injury caused by the defendant, and thus toll the statute of limitations. We therefore held that there was a material issue of fact as to whether Debiec exercised reasonable diligence in determining the cause of her injury. Id. at 136.

The plaintiffs contend that our holding in Debiec supports their argument that they exercised reasonable diligence because, like in Debiec, both the Mests and the Hallowells received diagnoses indicating that their injuries were not caused by the defendants. The Mests argue that the 1982 diagnosis from Penn State was sufficient to relieve any suspicions that Cabot's fluoride emissions were the cause of their cows' symptoms. The Mests argue that, as in Debiec, this potential misdiagnosis, along with their other actions, at least raises a material issue of fact as to whether they exercised reasonable diligence in determining the cause of their cows' symptoms. Similarly, the Hallowells argue that the 1996 New Bolton diagnosis ruling out fluoride as a potential cause of their cows' symptoms was, together with the other actions they took, sufficient to raise a material issue of fact as to whether they exercised reasonable diligence in ascertaining the cause of their injury.

### b. The District Court Decision

The District Court rejected the plaintiffs' arguments that the discovery rule should be applied, concluding that, as a matter of law, neither the Mests nor the Hallowells had exercised reasonable diligence in determining the cause of their injury. Although whether a plaintiff has exercised reasonable diligence is generally a factual question reserved for the jury, the District Court relied on the exception we have carved out for situations in which "the facts are so clear that reasonable minds cannot differ" as to whether the plaintiffs exercised reasonable diligence. Mest, 2004 WL 945131, at *5 n.40 (citing Bohus, 950 F.2d at 924; Cochran, 666 A.2d at 248). The District Court found that, taking the evidence in the light most favorable to the plaintiffs, "no reasonable jury could conclude that the Mests or Hallowells have satisfied [the] heavy burden" of demonstrating reasonable diligence. Id. at *5.

11

We disagree with this conclusion. In our view, the actions taken by the Mests and the Hallowells, together with the misdiagnoses that eliminated fluoride as the cause of their cows' symptoms, raise a material issue of fact as to whether each party exercised reasonable diligence in determining the cause of their injury. We will address the Mests and the Hallowells separately.

### c. The Mests

To determine whether the Mests exercised reasonable diligence, we must examine 1) whether the Mests exercised reasonable diligence before the 1982 Penn State study, 2) whether, under Debiec, the Mests were reasonable in relying on the Penn State study to relieve their suspicions that their injuries were caused by Cabot, and 3) if so, whether, in light of their reliance on the Penn State study, they exercised reasonable diligence.

Before consulting the experts at Penn State, the Mests consulted several other experts. As described above, upon first noticing his cows' symptoms, Mest consulted his veterinarian, agricultural extension agent, and nutritionist. Mest was told that the problem was with his cows' digestive systems, and he was advised to attempt nutritional solutions. Mest followed this advice and, when he did not see favorable results, he consulted new experts at Penn State. After extensive testing, the experts concluded that fluoride was not the cause of the cows' illness, but they were unable to provide a definitive diagnosis as to what the cause was. We conclude that a reasonable juror could find that the Mests' actions leading up to the Penn State study constituted reasonable diligence.

We next consider the Mests' contention that they were reasonable in relying on the Penn State study ruling out fluorosis to overcome their initial suspicions that fluorosis might be the cause of their cows' symptoms. As explained above, in Debiec we held that, although the statute of limitations begins to run when a plaintiff suspects he has an injury caused by another, a negative diagnosis ruling out the speculative injury may be sufficient to overcome that suspicion. Debiec, 352 F.3d at 132. Thus, a diagnosis ruling out the possibility that the plaintiff's injury was caused by another may, in effect, toll the statute of limitations under the discovery rule because it may lead the plaintiff to reasonably believe that his injury was not caused by the defendant.

12

The plaintiffs argue that, under Debiec, the Penn State study may have led them to reasonably believe that their cows did not suffer from fluorosis caused by the Cabot Facility. Therefore, the plaintiffs argue, there is at least a material issue of fact as to whether the Mests exercised reasonable diligence in ascertaining the cause of their injury after they received this diagnosis.

We agree with the plaintiffs. Here, as in Debiec, the Mests noticed their injury and suspected that the defendants' actions were to blame. As in Debiec, the Mests sought the advice of medical experts, who, after performing tests, assured the Mests that the suspected culprit was not the cause of the cows' symptoms. As explained above, the Mests allege that they never received the subsequent letter from Penn State notifying them that fluoride might be the cause of future problems, and there is evidence in the record that this letter was not correctly addressed to them. (JA at 143, 777, 2006, 2172.) Viewing the facts in the light most favorable to the plaintiffs, we accept as true the Mests' contention that they never received this letter and that they were therefore left with the diagnosis that fluoride was not the cause of their cows' symptoms. A reasonable juror could find that the plaintiffs acted reasonably in turning their inquiry elsewhere.

We find unconvincing the distinctions the District Court drew between this case and Debiec. The District Court noted that Debiec's reliance on her personal physician's diagnosis was inherently more reasonable than the plaintiffs' reliance on the diagnoses of veterinarians or scientists because a personal physician has a stronger relationship of trust with a patient than a veterinarian or scientist has with a farmer. Mest, 2004 WL 945131, at *7. The distinction between a patient's relationship with her doctor and a farmer's relationship with a veterinarian or scientist is irrelevant for the purposes of demonstrating reasonable reliance under Debiec where, we held, the reliance was reasonable "as long as the plaintiff retains confidence in the doctor's professional abilities." Debiec, 352 F.3d at 132. In the context of this case, a veterinarian or animal scientist plays the same role as a doctor by using professional medical and scientific expertise to interpret symptoms and diagnose a cause. In fact, farmers arguably rely more on the professional abilities of veterinarians and animal scientists than patients rely on their doctors because farmers can only observe the objective symptoms of their animals and must rely

13

on veterinarians and animal scientists to interpret those objective symptoms, whereas human patients know what they are experiencing and can describe it to their doctors.[8]

We also disagree with the District Court's finding that Debiec is inapplicable to this case because here there was no definitive diagnosis of the cows' illness. The important point in Debiec was not that the doctor diagnosed the wrong disease, but that the doctor ruled out the actual disease that would have implicated the defendant. See Debiec, 352 F.3d at 132 (stating that statute of limitations may be tolled where "a doctor affirmatively tells a claimant that she does not have a certain disease and therefore that the defendant was not the cause of her injury").

The District Court also distinguished this case from Debiec by noting that the Mest herd involved numerous different cows throughout the period the herd demonstrated symptoms, and therefore the Mests could not have reasonably relied on a negative diagnosis at one particular time. The fact that the herd consisted of different cows with the same symptoms throughout the years after the 1982 negative diagnosis does not imply that the Mests were unreasonable in continuing to believe that fluoride was not the cause of the cows' symptoms. A reasonable juror could conclude that the Mests made the fair assumption that, because their new cows showed symptoms identical to those of their old cows, there existed a common cause to these symptoms. Such a reasonable juror also could conclude that, having ruled out fluoride as the cause, the Mests reasonably directed their search toward other chronic problems on the farm that might have caused these

---

[8] Moreover, the District Court's reliance on the close and lengthy relationship between patients and doctors would exclude those patients who do not have the opportunity to form such a relationship with a doctor. Patients do not always form a long-term and close relationship with specialist doctors in particular due to, for example, the fact that patients may seldom need to see specialists or lack adequate insurance coverage to see them regularly. Yet, because of their expertise, these specialists are the very doctors in whom patients must often place the most trust. The District Court's reasoning would appear to find this trust inherently unreasonable, a conclusion that we cannot support.

symptoms.

The District Court also appears to have found the Mests' reliance on the Penn State study unreasonable because of evidence that, despite the results of the study, Merrill Mest continued to suspect his cows had fluorosis. Mest, 2004 WL 945131, at *7. The District Court based this conclusion on Betty Mest's deposition testimony that Merrill told her that there was fluoride contamination on the property two to three years after the results of the Penn State test. Id. However, the nature of Betty Mest's testimony is in dispute; later in the deposition she corrected herself and stated that her husband did not make that statement, and that she had been confused by the question. (JA at 782-86.) While the credibility of Betty Mest's retraction may be disputed, on a motion for summary judgment we must look at all facts in the light most favorable to the non-moving party. See Morton Int'l, 343 F.3d at 680. Therefore, we cannot, as the District Court did, assume that Merrill Mest suspected fluoride contamination on his farm after the Penn State study based on Betty Mest's contradictory testimony.

Given that, under Debiec, the Mests may have reasonably relied on the 1982 Penn State study to alleviate their suspicions that their cows had fluorosis, we consider next whether the Mests' actions after 1982 constituted reasonable diligence in light of their reliance on the Penn State study. As we have held, a misdiagnosis does not relieve a patient of all responsibility in pursuing the cause of her symptoms, and continued reliance on a misdiagnosis in the face of contrary evidence may be unreasonable. Bohus, 950 F.2d at 930 (holding that doctor's assurances that plaintiff does not have particular injury may toll statute of limitations until that "point in time when a patient's own 'common sense' should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor"); see also Debiec, 352 F.3d at 131-32 (citing Bohus). Given that the Mests did not receive a definitive diagnosis and continued to experience problems with their herd, they would not have exercised reasonable diligence had they simply ended their inquiry after the 1982 Penn State study.

The Mests, however, did not end their inquiry with the Penn State study. On the contrary, Mest continued to consult his nutritionist, veterinarian, and agricultural extension agent on a weekly or monthly basis to determine the cause of the symptoms,

and he routinely tested the cows for infections. He sought help twice from a state laboratory. He had his water and feed tested by both PADER and the EPA. This careful investigation demonstrates that the Mests continued to exercise what a reasonable juror might determine to be reasonable diligence in light of the Penn State study up until the 1999 diagnosis of fluorosis.

In sum, we hold that a material issue of fact exists as to whether the Mests exercised reasonable diligence sufficient to toll the statute of limitations under the discovery rule until the 1999 diagnosis by Dr. Krook.

### d. The Hallowells

We disagree with the District Court's finding that the Hallowells conducted little or no investigation into their cows' symptoms between 1972 and 1996. As described above, the Hallowells consulted dairy farm specialists, including veterinarians, nutritionists, breeders, and an agricultural extension agent. Suspecting radiation poisoning, Hallowell administered iodine to his cows. Upon the advice of nutritionists, the Hallowells altered the cows' nutritional program. Upon the advice that the problem might be chemical, they administered chemicals tests. The Hallowells contacted PADER and sent blood samples to experts at Michigan State University. The Hallowells installed a new air ventilation system and, upon the advice of their veterinarian, a new drinking water system. Given these numerous and varied efforts, a reasonable juror could conclude that the Hallowells exercised reasonable diligence to determine the cause of their cows' symptoms.

We also find that the 1996 New Bolton study may have lead the Hallowells to reasonably conclude that fluorosis was not the cause of their cows' symptoms. Like the Mests, the Hallowells noticed their injury and sought the advice of medical experts, who, after performing tests, assured the Hallowells that fluoride was not to blame. Therefore, for the reasons explained above, there is a material fact issue as to whether the 1996 New Bolton study led the Hallowells to reasonably believe that the defendants were not the cause of their injury.

Given that, under Debiec, the Hallowells may have reasonably relied on the 1996 New Bolton study, we next consider

whether the Hallowells' actions after the New Bolton study constituted reasonable diligence. As we previously stated, continued reliance on a misdiagnosis in the face of contrary evidence may be considered unreasonable as a matter of law. See Bohus, 950 F.2d at 930; Debiec, 352 F.3d at 132. Here, however, when their cows' symptoms did not subside despite the New Bolton Center's advice, the Hallowells continued to investigate their cows' illness by consulting the EPA. The EPA's tests – like those of the New Bolton Center – concluded that the cause was farm-specific and not environmental. Thus, until the 1999 diagnosis by GreenWatch, the Hallowells made continued efforts, which only confirmed the New Bolton study's conclusion that the cause was farm-specific and not caused by Cabot. Therefore, a reasonable juror could certainly find that the Hallowells exercised reasonable diligence following the 1996 New Bolton study.

We also disagree with the District Court that the Hallowells did not exercise reasonable diligence as a matter of law because of their failure to obtain the Davis Reports. Both the Hallowells and the Mests contacted PADER regarding their problems and were not told of the reports. Furthermore, not one of the experts the Hallowells and the Mests consulted found the reports until GreenWatch's investigation in 1999. These circumstances, we believe, raise at least a material issue of fact as to how easily these reports could have been obtained and whether reasonable diligence required the Hallowells to obtain them.

In sum, we hold that a material issue of fact exists as to whether the Hallowells exercised reasonable diligence sufficient to toll the statute of limitations under the discovery rule.

## 2. Tolling Due to Cabot's Alleged Fraudulent Concealment

The plaintiffs also argue that the statute of limitations should be tolled because Cabot fraudulently concealed the cause of the plaintiffs' injury. Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry." Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556 (3d Cir. 1985). The plaintiffs allege that, during the Hallowells' discussions with representatives of the Cabot Facility in the 1970s and 1996, Cabot concealed its knowledge about potential fluoride contamination and misled the Hallowells

17

through its assurances that fluoride from the Cabot Facility could not be the cause of their cows' injuries. Specifically, the Hallowells allege that Cabot told them that there was no danger from the Cabot Facility, that Cabot monitored its fluoride emissions closely to ensure they were at safe levels for crops and animals, and that the emissions were not in sufficient quantities to harm the Hallowells' cows. (JA at 448.) The plaintiffs argue that, because Cabot knew of the Davis Reports when it made these misrepresentations, its actions constitute fraudulent concealment sufficient to toll the statute of limitations.

The District Court rejected this argument, holding that it was unreasonable for the plaintiffs to rely on any statements made by Cabot. Like the discovery rule, the fraudulent concealment doctrine does not toll the statute of limitations where the plaintiff knew or should have known of his claim despite the defendant's misrepresentation or omission. Bohus, 950 F.2d at 925-26. Where common sense would lead the plaintiff to question a misrepresentation, the plaintiff cannot reasonably rely on that misrepresentation. Id. at 925. The District Court held that, here, "it was not reasonable for Plaintiffs to rely on the statements of a company they suspected of poisoning their cow herds" and that "it was unreasonable for Plaintiffs to continue to rely on those statements when their cows continued to have problems." Mest, 2004 WL 945131 at *9.

In our view, whether Cabot's assurances caused the Hallowells to reasonably believe that their problems were not caused by Cabot is an issue best decided by a fact-finder. Generally, where reasonable minds can disagree, questions of whether fraudulent remarks were made and whether the plaintiff was reasonable in relying on them or continuing to rely on them are left to the jury. See Fine v. Checcio, 870 A.2d 850, 862 (Pa. 2005) (question of what statements were actually made by defendant was best answered by jury); Drelles v. Mfrs. Life Ins. Co., 881 A.2d 822, 832 n.6 (Pa. Super. 2005) ("[I]t is for the jury to say whether fraudulent remarks actually were made."); Crown Cork & Seal Co. v. Montgomery, McCracken, Walker & Rhoads, LLP, No. 03185, 2003 WL 23120185, at *3 (Pa. Com. Pl. 2003) (whether plaintiff reasonably relied on defendants' allegedly false statements was question of fact best decided by jury). We conclude that rational jurors could find that it was reasonable for the Hallowells to rely on

the statements made by Cabot.

However, we note that the Mests may not assert the doctrine of fraudulent concealment to toll the statute of limitations. The record on appeal does not disclose any communication between the Mests and Cabot or that Cabot made potentially misleading statements to the Mests as it did to the Hallowells. Under the doctrine of fraudulent concealment, "[t]here must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." Bohus, 950 F.2d at 925. Silence can constitute fraud only where there is an affirmative duty to disclose because of a fiduciary relationship between the parties or a similar relationship of trust and confidence. Chiarella v. United States, 445 U.S. 222, 227-28 (1980); Sevin v. Kelshaw, 611 A.2d 1232, 1236 (Pa. Super. 1992); Smith v. Renaut, 564 A.2d 188, 192 (Pa. Super. 1989).

We disagree with the plaintiffs' argument that Cabot had a duty to disclose the existence of the Davis Reports to the Mests. This argument implies that Cabot had an affirmative duty to disclose to all area farmers, without their inquiry, the existence of public reports that raised possible concerns for the farmers. The plaintiffs offer no precedent suggesting such a duty; rather, they cite cases regarding the duty of care in a negligence action. See, e.g., Miller v. Group Voyagers, Inc., 912 F. Supp. 164, 167 (E.D. Pa. 1996); Snyder v. ISC Alloys, Ltd., 772 F. Supp. 244, 253 (W.D. Pa. 1991); Venzel v. Valley Camp Coal Co., 156 A. 240, 242 (Pa. Super. 1931). These cases do not demonstrate that a relationship of trust existed between Cabot and the Mests such that Cabot's failure to disclose the existence of the Davis Reports constituted fraudulent concealment. Moreover, the plaintiffs do not define the parameters of this alleged duty, such as which area farmers were owed this duty and how long this duty persisted after the Davis Reports were published as, presumably, new farmers moved into the area. We cannot find that such a sweeping duty exists under Pennsylvania law.

## B. Fraud Claims

The plaintiffs assert claims for fraud and fraudulent misrepresentation and concealment. These claims are the same claims of fraud that they argue tolled the statute of limitations. The District Court dismissed these claims on the same grounds it

dismissed the claims of tolling based on fraud; specifically, it found that the plaintiffs could not have reasonably relied on Cabot's statements. Mest, 2004 WL 1102754, at *6.

For the reasons explained above, we hold that material issues of fact exist as to whether Cabot made fraudulent statements and whether the Hallowells reasonably relied on such statements. Because, however, the Mests do not allege that Cabot made any statements or misrepresentations to them, we affirm the District Court's grant of summary judgment with regard to the Mests' claims of fraud and fraudulent concealment and misrepresentation.

## C. Negligence Per Se Claims

The plaintiffs argue that the District Court erred in granting summary judgment dismissing their claim of negligence per se based on Cabot's alleged violation of Section 4013.6(c) of the Pennsylvania Air Pollution Control Act ("PAPCA"), 35 Pa. Stat. Ann. § 4001 et seq. Under the doctrine of negligence per se, a violation of a statute may be grounds for finding that a defendant is per se liable. To assert a claim for negligence per se, the plaintiffs must demonstrate that: 1) the statute or regulation clearly applies to the conduct of the defendant; 2) the defendant violated the statute or regulation; 3) the violation of the statute proximately caused the plaintiff's injuries; and 4) the statute's purpose is, at least in part, to protect the interest of the plaintiff individually, as opposed to the public. See Wagner v. Anzon, Inc., 684 A.2d 570, 574 (Pa. Super. 1996).

We agree with the District Court that the plaintiffs' claim must fail because the plaintiffs cannot demonstrate that the statute's purpose is to protect the interest of the plaintiffs in particular as opposed to the general public. In Wagner, the Pennsylvania Superior Court rejected a similar negligence per se claim brought by neighbors against a nearby factory that they alleged had violated the Philadelphia Air Management Code of 1969 (the "Philadelphia Code"). Id. at 573-75. After reviewing the text and legislative history of the Philadelphia Code, the Pennsylvania Superior Court concluded that the statute was "a general environmental protection statute that has the interests of the City community as a whole at the heart of its purpose." Id. at 575. The court also noted that "a statute governing air quality, by its nature, is directed to the

20

population in general." Id. at 575 n.4. The court held that, as a general environmental protection statute, the Philadelphia Code's purpose was to protect the entire community rather than the plaintiffs specifically. Id. at 575.

We conclude that, like the Philadelphia Code, the PAPCA is an environmental statute governing air quality with the purpose of protecting the general public rather than the plaintiffs in particular. The text of the PAPCA states that it is intended to protect the "public health, safety and well-being [of Pennsylvania] citizens." 35 Pa. Stat. Ann. § 4002(a). The plaintiffs note that the statute also states that it is intended to prevent "injury to plant and animal life and to property" and to encourage the "development, attraction and expansion of industry, commerce and agriculture."[9] Id. However, these broad statements do not establish an intent to protect the plaintiffs as dairy farmers specifically rather than the population of Pennsylvania in general. Similarly, in Wagner, references to the "health and welfare" of Philadelphia inhabitants and the protection of "recreation, commerce and individual activity" in the statute did not indicate a specific intention to protect the plaintiffs. Wagner, 684 A.2d at 574-75.

Because the plaintiffs cannot demonstrate that the PAPCA was intended to protect them specifically as opposed to the general population, summary judgment dismissing their claim for negligence per se is appropriate.

### D. Emotional Distress Damages

The plaintiffs argue that the District Court erred in finding

---

[9]The plaintiffs also cite Goldsborough v. Columbia Borough, 48 Pa. D. & C. 3d 193 (Pa. Com. Pl. 1988), in which the Lancaster County Court of Common Pleas held that the PAPCA allows a cause of action for negligence per se. Id. at 198. However, we agree with the District Court's reasoning that Goldsborough is not dispositive because the Goldsborough opinion gave no explanation for the court's conclusion and has never been cited by another court, and because it is inconsistent with the more recent Wagner case. Mest, 2004 WL 1102754, at *4 n.18.

21

that they were not entitled to emotional distress damages for any of their claims. The plaintiffs allege that Cabot's actions injured their cows and their livelihood, causing them to experience decades of emotional distress in the form of worry, headaches, chest pains, arm numbness, and lack of sleep. The District Court found that, under Pennsylvania law, a plaintiff may not recover emotional distress damages absent actual or potential physical injury caused by the defendant. Mest, 2004 WL 1102754, at *5-6. The District Court found that, because the plaintiffs allege no physical injury, they may not recover emotional distress damages. Id.

We agree with the District Court that Pennsylvania law permits recovery for emotional distress as a result of the defendant's negligence only where the claim includes physical injury or in limited circumstances where the plaintiff witnesses injury to another. See Armstrong v. Paoli Mem'l Hosp., 633 A.2d 605, 609 (Pa. Super. 1993); Houston v. Texaco, Inc., 538 A.2d 502, 506 (Pa. Super. 1988); Tressler v. Priester-Hoover, 31 Pa. D. & C. 4th 73, 75 (Pa. Com. Pl. 1996). Pennsylvania law does not allow for recovery for emotional distress damages resulting from a defendant's negligent injury to property. See Brooks v. Hickman, 570 F. Supp. 619, 619-20 (W.D. Pa. 1983); Houston, 538 A.2d at 506; Tressler, 31 Pa. D. & C. 4th at 75; Casey v. Pennsylvania-American Water Co., 12 Pa. D. & C. 4th 168, 171-73 (Pa. Com. Pl. 1990). Because the plaintiffs' claims do not fall within these limitations, the plaintiffs may not recover emotional distress damages for their claims based in negligence.[10]

---

[10] The plaintiffs cite Little v. York County Earned Income Tax Bureau, 481 A.2d 1194 (Pa. Super. 1984), for the proposition that a plaintiff may recover emotional distress damages under Pennsylvania law for negligence even if the plaintiff suffers no physical injury. In Little, the Superior Court of Pennsylvania allowed the plaintiff to collect damages for "humiliation, degradation, and mental anguish" where the plaintiff's reliance on the negligent misrepresentations of the defendant, a tax collection service, to the plaintiff regarding her local wage tax was the proximate cause of her being arrested and jailed for failure to pay taxes. Id. at 1199, 1202. We note, however, that the Little holding was explicitly limited to the facts of the case, which are quite

On the other hand, plaintiffs who allege an intentional tort may obtain damages for emotional distress even if they have not suffered physical injury. See, e.g., Papieves v. Lawrence, 263 A.2d 118, 121-22 (Pa. 1970); see also Hackett v. United Airlines, 528 A.2d 971, 974 (Pa. Super. 1987). We therefore conclude that, under Pennsylvania law, the plaintiffs may recover emotional distress damages for their claims related to fraud and trespass. See, e.g., Bobin v. Sammarco, No. Civ. A. 94-5115, 1995 WL 303632, at *3 (E.D. Pa. May 18, 1995) (allowing emotional distress damages for fraud under Pennsylvania law); Tran v. Gen. Motors Acceptance Corp., Civ. A. No. 88-1836, 1989 WL 64564, at *2 (E.D. Pa. Jun. 13, 1989) (allowing emotional distress damages for trespass under Pennsylvania law); MacGregor v. Mediq Inc., 576 A.2d 1123, 1127 (Pa. Super. 1990).

## III. Conclusion

For the reasons stated above, we will vacate the District Court's opinion in part, affirm it in part, and remand the case for further proceedings consistent with this opinion.

---

different from those at hand. Id. at 1202. Moreover, the Pennsylvania Superior Court has subsequently interpreted Little as a limited exception to the rule that emotional distress damages are not allowed for claims of negligence where the plaintiff has suffered no physical injury. See Rolla v. Westmoreland Health Sys., 651 A.2d 160, 163 & n.2 (Pa. Super. 1994); Houston, 538 A.2d at 504 & n.2.