**HARRY MILLER CORPORATION,**
Plaintiff,

v.

**MANCUSO CHEMICALS LIMITED,**
Defendant.

No. 99–CV–2669.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 2007.

## MEMORANDUM

ANITA B. BRODY, District Judge.

### I. *Introduction* [1]

Plaintiff Harry Miller Corporation ("Miller") brings this action against defendant Mancuso Chemicals Limited ("Mancuso") for misappropriation of a trade secret, conspiracy to misappropriate a trade secret, tortious interference with prospective contract, breach of contract, punitive damages and unjust enrichment.[2] Mancuso filed seven separate summary judgments on the basis of the statute of limitations, laches, and the merits of each claim.

### II. *Jurisdiction and Summary Judgment Standard*

Federal subject matter jurisdiction exists to consider Miller's state law claims pursuant to 28 U.S.C. § 1332.[3]

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### III. *Background* [4]

Plaintiff Miller is a Philadelphia chemical company that manufactures and sells chemical products, including a hydrochloric acid inhibitor known as Activol 1803 ("Activol"). Defendant Mancuso is a Canadian

---

1. To aid the parties' preparation for trial, the order issued on January 3, 2007.

2. This Court previously dismissed Miller's RICO claims, Counts II and III of the Amended Complaint. *See* Memorandum & Order (December 22, 2006).

3. Defendant has renewed its motion to dismiss for lack of personal jurisdiction (Doc. # 355). That motion will be addressed in a

separate memorandum. For the purposes of this motion, I assume that this Court has personal jurisdiction over the parties.

4. I state the facts in the light most favorable to Plaintiff, the non-moving party, and take its allegations as true when supported by proper proofs wherever those allegations conflict with those of Defendant. *See Kopec v. Tate*, 361 F.3d 772, 775 (3d Cir.2004).

chemical company and a competitor of Miller. Steel submerged in acid develops "scale."[5] An acid inhibitor removes scale, while protecting the steel from further corrosion. From 1984 through 1990, Miller was selling its Activol product to two large Canadian steel companies, Dofasco Steel and Stelco Steel. During that period, Dofasco bought acid inhibitor exclusively from Miller. This commitment to exclusive use was based on extensive testing by Dofasco. Pl.'s Opp., 7.

In December, 1990, Miller's former employee, Paul Carr, left Miller's employ and set up a competing chemical company, Carr Chem, Inc. Miller contends that Carr stole the formula for Activol before leaving Miller and that around January 3, 1991, communicated it to Mancuso. Thereafter, Carr and Mancuso began selling a competing acid inhibitor, known as "Can–Hib," that Miller maintains is identical to or derived from Activol. Shortly after Carr's departure from Miller, Dofasco and Stelco ceased placing orders with Miller and began buying Can–Hib from Carr and Mancuso.

*Carr Chem and Mancuso's Agreement*

On December 28, 1990, Carr Chem entered into a confidentiality agreement with Mancuso to govern the use of proprietary information about the Can–Hib formula ("Carr Chem–Mancuso agreement"). The agreement was signed by John Henstock, general manager of Mancuso, and accompanied by a cover letter from Paul Carr. Pl.'s Ex. 20. The agreement provides, in part, the following:

- INFORMATION refers to all information, drawings, specifications, data, know-how and all other communication, oral or written, disclosed or provided to RECIPIENT by CARR CHEM, INC. regarding CARR CHEM, INC.

- Recipient will keep all INFORMATION confidential and will not, without the prior written consent of CARR CHEM, INC. disclose any INFORMATION to any third party, except RECIPIENT'S officers and employees on a "need to know" basis in furtherance of RECIPIENT'S evaluation.

- Recipient will not use, either directly or indirectly, any INFORMATION for any purpose whatsoever, other than for the purpose of blending and/or reacting the following: COP–BRA–1 (synthetic milling lubricant), CAN–HIB–1991 (HCL inhibitor), and any other formulation marked "confidential" for CARR CHEM, INC. without the written consent of CARR CHEM, INC.

- Recipient represents and warrants and its officers and employees to whom INFORMATION is communicated hereunder are obligated not to use or disclose the INFORMATION or any other confidential information regarding the business of CARR CHEM, INC. obtained in the course of their employments, and RECIPIENT shall ensure that INFORMATION is not used or disclosed by such employees and officers except as permitted by this Agreement.

- All tangible INFORMATION, including, without limitation, drawings, blueprints, designs, parameters of design, monographs, specifications, flowsheets, sketches, descriptions, data and other tangible material pertaining thereto shall remain the property of CARR CHEM, INC. Immediately upon the request of CARR CHEM, INC., RE-

5. As much as I would like to know, no one has explained why anyone would submerge steel in acid. Henceforth, I will assume this is necessary for someone to do.

CIPIENT may retain a copy of the disclosure in its files solely for the purpose of identifying its obligations of confidentiality.

- All written disclosures of INFORMATION considered confidential by CARR CHEM, INC. shall bear the notation "Confidential." Any non-written disclosures of confidential information shall be confirmed in a written document within thirty (30) days following the non-written disclosure to RECIPIENT. The written confirmation shall be addressed to the officers and/or employees of RECIPIENT who received the non-written disclosure of confidential INFORMATION.

- Nothing herein shall be construed as giving RECIPIENT any right, title, interest in or ownership of INFORMATION. . . .

- This Agreement shall commence as of the date of signing by RECIPIENT and shall continue for a period of three (3) years thereafter, subject to the confidentiality obligations stated above and inures to the benefit of and shall be enforceable by CARR CHEM, INC. and its successors. Pl.'s Ex. 20.

- The Agreement is made in consideration of the disclosure of INFORMATION to be made, permitted, or facilitated by CARR CHEM, INC.

*Id.*

### *Dofasco's Decision to Purchase Can–Hib*

Dofasco was among Carr and Mancuso's first customers in early 1991. Mancuso contends that Dofasco's decision to switch acid inhibitors resulted, in part, from problems Dofasco's subsidiary experienced with Activol, and from Miller's inability to solve the problem. Dofasco had acquired a company known as Algoma Steel in the 1980s. Def.'s Ex. 25 at 40 (J. Love depo.). Because of Dofasco's long-standing use of Activol, Dofasco recommended that Algoma run trials using Activol. *Id.* During the trials, Algoma experienced severe problems with scale removal, which slowed productivity. *Id.* at 41. Dofasco had never before realized that an inhibitor could affect productivity. *Id.* Miller was unable to offer new formulations to solve this perceived problem. *Id.* at 52. Accordingly, Dofasco ordered a number of trials to evaluate the performance of difference inhibitors. *Id.* Dofasco performed tests in 1991 and determined that Can–Hib performed better than Activol. Def.'s Ex. 32 at 14 (Wood depo.). While Activol would "pop out" of solution, Carr's product "surpassed anything [Dofasco] had used in the past." Def.'s Ex. 24 at 72–73 (Wainwright depo.).[6] Dofasco eventually switched to Can–Hib.

Dofasco continued to use Can–Hib for many years, but in 1996, it decided to run trials on the leading acid inhibitor products to determine which one provided the steel base with the greatest protection when submerged in an acid bath. Dofasco's testing showed Activol performed better than Can–Hib and an inhibitor produced by Crown Technology. Pl.'s Ex. 49. The testing resulted in a recommendation that Dofasco conduct a full trial using Activol, but no such trial was ever conducted. *Id.* Dofasco's senior purchasing agent explained that product trials could last for years, and often the trials do not result in

---

**6.** Miller contends that this testimony is "disputed" because of a sales call report by Miller's chemist, Mr. Nick Ariano. Def.'s Ex. 93. In the report, Mr. Ariano states that Don McMillan of Dofasco told him that he had no problems with Activol. Because this statement is offered for the truth of the fact that Dofasco had no problems with Activol, the statement by Mr. McMillan is inadmissible hearsay, and therefore, not part of the summary judgment record.

any commitment by Dofasco to purchase any of the products tested. Def.'s Ex. 20 at 49 (McMillan depo.). If neither Miller nor Mancuso were available to provide an acid inhibitor to Dofasco, Dofasco's purchasing agent noted that Dofasco could purchase one from Crown Technology, one of the largest suppliers of acid inhibitor product in Canada. Def.'s Ex. 38 at 122 (Julien depo.).

*Miller Learns Dofasco Has Been Buying Carr's Inhibitor*

Meanwhile, Miller started learning how it had lost a valuable customer. In February 1991, Miller learned that Dofasco was buying an acid inhibitor from Carr. Ex. 67 at 130–131 (Entwisle depo.). In May 1991, Miller hired Stephen Dale, a sales representative, to replace Carr, and gave him the task of finding out what inhibitor Stelco was using. Def.'s Ex. 43 at 30–33 (Dale depo.). Dale learned that Stelco was buying Carr's inhibitor. *Id.* Miller's sales manager raised questions about how Carr could have obtained a formula for an inhibitor so quickly after leaving Miller. Def.'s Ex. 8 at 167–171 (Ariano depo.). Miller also believed that Carr had no manufacturing ability. Def.'s Ex. 67 at 210.

Miller's current president and then-sales manager, Bruce Entwisle, was "alarmed" by the loss of the Stelco and Dofasco accounts. By August 1991, he had developed suspicions that Carr had stolen the formula for Activol. Def.'s Ex. 42 at 63–64. Mr. Entwisle asked Dofasco's mill manager for the identity of Carr's manufacturer. Def.'s Ex. 67 at 179. The mill manager told him he did not remember. *Id.* Mr. Entwisle believed this was a "boldfaced lie," but he did not try to obtain that information from anyone else at Dofasco. *Id.* Mr. Entwisle also asked Stelco who was manufacturing Carr's inhibitor, but Stelco's employee was "evasive" and told him it was none of Miller's business.

Def.'s Ex. 41; Ex. 67 at 188–189. Nobody at Miller asked Carr directly whose formula he was using. Def.'s Ex. 67 at 209. Mr. Entwisle testified that, "[T]he assumption was that somebody was making it [the competing acid inhibitor] for him.... We knew he [Carr] wasn't making it, so we didn't care who was making it." *Id.* at 210.

In 1991 and again in 1994, Miller obtained samples of Carr's product in order to assess the similarity of Carr's inhibitor to Activol because Miller believed that the two products were "very, very similar." Def.'s Ex. 5 at 248. Miller obtained the first sample on July 16, 1991, and ran performance tests. Def.'s 45. The test results showed that Can–Hib performed slightly better at higher concentrations, while Activol performed better at lower concentrations. *Id.* Miller's chemist, Mr. Nick Ariano, prepared the report and concluded that the performance differences between the two inhibitors were significant. Def.'s Ex. 45, 46. Miller performed additional tests in 1995 and concluded that the formulas for Can–Hib and Activol were identical. Def.'s Ex. 52. Mr. Ariano admitted that Miller's tests of Can–Hib were designed to help Miller regain the business it had lost, not to determine the source of Carr's formula. Def.'s Ex. 8 at 172. ("Well, our discussions at that point [after obtaining a sample of Carr's inhibitor] were to try to regain the business at Stelco and Dofasco. We didn't have any discussions at that point as to what direction we were going to take to try and find out where Carr's inhibitor came from.") Despite Miller's suspicions that Carr had stolen Miller's formula, Miller made a "rational business decision" not to sue Carr because of uncertainty regarding the source of Carr's product, Miller's ability to recapture the lost business, and

Carr's net worth and his ability to pay a judgment. Pl.'s Ex. 83 (Entwisle decl.).

In 1994, Mr. Entwisle succeeded his father as President of Miller, but he could not recall if investigating the origins of Carr's product was a priority because he assumed a range of new responsibilities and "took things in the order in which they were presented." Def.'s Ex. 42 at 72–73.

*Miller Learns About Carr's Manufacturer*

Over the course of the 1990s, Miller continued to make sales calls and send out product samples in the hopes of regaining business from Dofasco and Stelco, but these efforts proved unsuccessful. Pl.'s Ex. 83, ¶ 26. During sales calls, Miller's customers discussed Carr Chem's products, but no customer ever mentioned Mancuso by name prior to 1996. For example, CVL Rubber Products, one of Miller's Canadian customers, informed Miller in July 1991 that it believed one of Carr's products was "coming out of Niagara Falls." Ex. 44. The report failed to mention any manufacturer by name. *Id.* Stephen Dale, Carr's replacement, also learned from Stelco that Stelco did not trust Carr's manufacturer, but Stelco did not identify this manufacturer for Dale. Def.'s Ex. 50. At some point prior to March 11, 1996, Stelco told Miller that Mancuso was manufacturing Carr's acid inhibitor. Def.'s Ex. 42 at 76–77 (Entwisle depo.).

*Miller v. Carr Litigation*

In 1996, Carr expanded his operations into the American steel market. In 1997, Miller sued Carr and Carr Chem for misappropriation of trade secret in a lawsuit, *Harry Miller Corporation v. Paul Carr and Carr Chem, Inc.* (the "Carr litigation"). During the Carr litigation, at least one Dofasco employee believed that Miller had considered suing Dofasco:

Q: Did Harry Miller ever suggest to you or to your knowledge suggest to anyone else at Dofasco that Dofasco and/or any of its current or former employees might be added as defendants to Miller's 1997 lawsuit against Carr Chem?

A: Yes.

. . .

Q: And how did you become aware of that information?

A: I believe I learned it from Bruce [Entwisle].

Def.'s Ex. 35 at 114–116 (Nederpel depo.).

During the Carr litigation, Carr initially characterized Mancuso as an outside blender, but he later recanted and testified that Mancuso was the true owner of the Can–Hib formula. Carr asserted in a declaration that Mancuso and a company known as AST served as "outside blenders" for Carr Chem. Pl.'s Ex. 33. Carr also stated that he had purchased the formula for Can–Hib from man in the chemical industry named Gary Young. Pl.'s Ex. 34. In a later deposition, Carr testified that Mancuso, not Carr, purchased the acid inhibitor formula in 1991, and that Mancuso owned that formula. Pl.'s Ex. 1 at 29, 30–34, 37–39. Carr further stated that he had no knowledge if Mancuso had ever paid for the formula. *Id.* at 184. Documents obtained by Miller also suggested that Carr Chem held itself out the manufacturer of Can–Hib. A Material Safety Data Sheet for Can–Hib listed Carr Chem as the manufacturer. Pl.'s Ex. 15. Carr Chem letterhead described Carr Chem as a manufacturer and distributor. Pl.'s Ex. 18. Invoices showed that Carr Chem, not Mancuso, billed customers directly. Pl.'s Ex. 46–48.

*Miller v. Carr Settlement*

In 1999, Miller and Carr entered into a settlement agreement ("Carr settlement") that provided, in part:

Defendants [Paul Carr and Carr Chem] hereby assign any and all rights and title to Can–Hib 1990, Can–Hib 1991, the Can–Hib line of hydrochloric acid inhibitors, and any and all hydrochloric acid inhibitor sold, owned, or marketed by defendants, including but not limited to the formulae for such products[,] to Harry Miller, including but not limited to any rights or claims against Mancuso Chemical, Inc. with respect to such products and formulae.

Pl.'s Ex. 40, ¶ 6.

*Mancuso's Continuing Sales of Can–Hib*

After the settlement in 1999, Mr. Entwisle sent a letter to Dofasco's purchasing agent, Robert Julien, indicating that Miller "stand[s] ready to supply you with the same product you have been buying since you started using hydrochloric acid inhibitor." Pl.'s Ex. 41. Carr also wrote to Dofasco, asserting that Mancuso "will continue to supply Dofasco Steel with the hydrochloric acid inhibitors, but will invoice Dofasco Steel directly." Pl.'s Ex. 42. Counsel for Mancuso wrote to Miller warning Miller that Mancuso owned Can–Hib and that Carr had no proprietary rights in Can–Hib and could not have assigned any such rights to Miller. Pl.'s Ex. 76. Mancuso continued to sell Can–Hib to Dofasco.

In response to Mancuso's continuing sales of Can–Hib, Miller demanded that Mancuso cease and desist manufacturing Can–Hib, but Mancuso refused. Am. Compl. ¶ 52. Mancuso subsequently changed the name of the product from Can–Hib to "Man–Hib," but advised Dofasco that the products were identical. Pl.'s Ex. 75 at 102–103 (Nederpel depo.). Dofasco's purchasing agent testified that he had believed Carr was the owner of the formula for Can–Hib until Mancuso announced otherwise after the *Miller v. Carr* settlement. Pl.'s Ex. 56 at 65. Mancuso continues to sell Man–Hib to Dofasco to this day.[7]

## IV. Misappropriation of a Trade Secret

Miller claims that Mancuso misappropriated its trade secret and continues to profit from wrongful use of the formula.

### A. Substantive Claim

■ To withstand summary judgment on a claim of misappropriation of a trade secret, Miller must establish a genuine issue of material fact as to the following elements: (1) the existence of a trade secret; (2) that was communicated in confidence by the plaintiff to an employee; (3) disclosed by an employee in breach of that confidence; (4) acquired by a competitor with knowledge of the breach of confi-

---

7. By way of further background relating to the parties' contentions, and not stated in the light most favorable to either party, Mancuso denies that it misappropriated Miller's trade secret. Instead, it maintains that it independently developed the formula for Can–Hib based on a formula it obtained at a meeting with Carr and others in the chemical industry on January 3, 1991. At that meeting, Mancuso contends, a man named Gary Young passed a formula for an acid inhibitor across the table. Mancuso further claims that Mancuso's general manager at the time, James Gallagher, asked twice if the formula was proprietary, and both times, Young answered "no." Days later, Gallagher asked Carr if the formula was proprietary, and Carr said "no."

Mancuso contends that the formula it obtained from Young was unworkable, and that it produced a viable product only after John Henstock, Ph.D., who worked for Mancuso, refined the formula through experimentation in days following the meeting. Miller contends that Mancuso's formula for Can–Hib is identical to or derived from the formula for Activol, and that the "smoking gun" proof of misappropriation is Mancuso's use of the same surfactant, or wetting agent. Mancuso contends that it selected that surfactant on the advice of personnel at the chemical supply company Rhone Poulenc. Mancuso is unable, however, to produce any documentation regarding its communications with Rhone Poulenc.

dence; (5) and used by the competitor to the detriment of the plaintiff. *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429–430 (3d Cir.1982). In addition, Pennsylvania law requires a plaintiff to show that the trade secret is "valuable to him, that it is important in the conduct of his business, and that the plaintiff has a right to the trade secret by reason of discovery or ownership." *Id.* at 430. Because there is sufficient evidence on the record that Activol is a trade secret of Miller, that Miller communicated the trade secret to Carr in confidence, that Carr disclosed the trade secret in breach of that confidence, that Mancuso acquired the trade secret in knowledge of that breach, that Mancuso used the trade secret to the detriment of Miller, that the trade secret is valuable to Miller, important in the conduct of Miller's business, and that Miller has a right to the trade secret by reason of discovery or ownership, defendant's motion for summary judgment on Miller's claim for misappropriation of a trade secret was denied.

### B. *Statute of Limitations*

Mancuso contends that even if Miller's misappropriation of trade secret claim withstands summary judgment on the merits, it must be dismissed because Miller filed suit after the statute of limitations expired. Because this is a diversity action, Pennsylvania law dictates the applicable statute of limitations on Miller's state law claims. *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir.2006).

#### 1. *Statutory period*

The statute of limitations for misappropriation of a trade secret in Pennsylvania is two years. 42 Pa. Cons.Stat. § 5524(7); *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, 393 F.Supp.2d 348, 354 (W.D.Pa.2005). The statute of limitations begins to run when an injury is sustained. *Mest*, 449 F.3d at 510. In the tort of misappropriation of a trade secret, the statute of limitations begins to run when the event that actually injured the plaintiff occurs. In this case, the statute of limitations began to run when Mancuso and Carr made and sold Can–Hib in 1991. The statutory period ended in 1993. Miller did not file suit until 1999, or six years after the statute of limitations expired. Therefore, Miller filed this suit after the initial misappropriation had occurred.

#### 2. *Tolling*

Miller argues that its claim for misappropriation of a trade secret persists because Miller had no reason to know of Mancuso's role in the misappropriation prior to 1998, when Mancuso's employees testified during the Carr litigation. Miller invokes two tolling doctrines, the "discovery rule" and the doctrine of fraudulent concealment.

##### a) Discovery rule

Once the statutory period has expired, the discovery rule triggers the tolling of the statute of limitations when the plaintiff is "unable, *despite the exercise of reasonable diligence,* to discover the injury or its cause." *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir.2006) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce*, 503 Pa. 80, 468 A.2d 468, 471 (1983)) (emphasis in original). Thus, a plaintiff is obligated to exercise reasonable diligence in determining the existence of the injury and its cause. *Id.* at 511. Reasonable diligence means that a plaintiff has investigated his injury with sufficient "attention, knowledge, intelligence and judgment which society expects of its members...." *Id.* (quoting *Cochran v. GAF Corp.*, 542 Pa. 210, 666 A.2d 245, 249 (1995)). The question of whether a plaintiff has exer-

cised reasonable diligence is generally a question for the jury, but the Court may decide that the discovery rule does not apply as a matter of law where reasonable minds would not differ about whether the plaintiff knew or should have known through the exercise of reasonable diligence of his injury and the cause of his injury. *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858–859 (2005). If the discovery rule applies, then the statute of limitations begins to run as soon as the plaintiff knows or reasonably should know that: (1) he is injured and (2) his injury is caused by another's conduct. *Mest*, 449 F.3d at 510.

■ Once the statute of limitations expires, the plaintiff bears the burden of showing that the claims were timely filed because of an applicable tolling doctrine. *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1162 (3d Cir.1979). Thus, Miller bears the burden of demonstrating reasonable diligence in determining the existence of injury and cause of injury. *Id.* Pennsylvania courts apply the discovery rule "in only the most limited of circumstances." *Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164, 171 (1997).[8]

*Mest* provides guidance regarding what evidence of reasonable diligence may withstand summary judgment. 449 F.3d 502. In *Mest*, a group of dairy farmers sued a factory owner, alleging that the factory emitted hydrogen fluoride that caused fluorosis in their cows over several dec-ades. *Id.* at 506. The farmers had noticed symptoms of illness in their cows as early as 1972. *Id.* at 507. The farmers consulted veterinary and agricultural experts and administered every remedy the experts recommended over a period of twenty years. *Id.* In 1979, the farmers contacted the Pennsylvania Department of Environmental Protection ("PADER") for help. PADER and Cabot had been investigating crop damage around the Cabot factory. PADER retained a scientist from Penn State who concluded that cattle feeding on contaminated crops could develop fluorosis, but PADER and Cabot never disclosed this report to the farmers. *Id.* at 508. The farmers also retained an expert at the University of Pennsylvania, who specifically concluded that fluoride was not the cause of the cows' illness, and that the most likely cause was farm-specific. *Id.* The Environmental Protection Agency arrived at the same conclusion. *Id.* In 1999, an investigator for an environmental watchdog group contacted the farmers about their problems, and the farmers paid the watchdog group to conduct an investigation. The scientist retained in the investigation tested the cows and concluded that the cows suffered from fluorosis, which was caused by consumption of contaminated vegetation. *Id.* After the diagnosis in 1999, the farmers entered into a tolling agreement with Cabot, and when

8. In *Dalrymple*, the plaintiff was an adult woman who brought a lawsuit for sexual abuse she suffered as a child. *Id.* at 220, 701 A.2d 164. Defendant argued that the statute of limitations barred Dalrymple's claims. *Id.* at 221, 701 A.2d 164. Dalrymple argued that the statute of limitations was tolled because that she had repressed her memory of the abuse, and therefore, lacked the capacity to discover facts relating to her injury within the statutory period. *Id.* at 223, 701 A.2d 164. The Pennsylvania Supreme Court ruled that the requirement of reasonable diligence was objective, and not unique to a particular plaintiff. *Id.* at 224, 701 A.2d 164. Therefore, a plaintiff's incapacity to remember abuse did not relieve her of her obligation to seek relief within the statutory period. *Id.* at 228, 701 A.2d 164. The Court ruled that the discovery rule applies only where the injury is such that "no amount of vigilance will enable the plaintiff to detect an injury." *Id.* at 228–229, 701 A.2d 164. Because sexual abuse was discoverable by the victim immediately, when the injury was inflicted, the discovery rule did not apply. *Id.*

the agreement expired, the farmers filed suit in 2001. *Id.* at 509.

The district court granted summary judgment to the defendants on the basis of the statute of limitations. *Id.* at 510. The farmers admitted that they knew of their injury prior to the two year statutory period, but they argued that the discovery rule and fraudulent concealment doctrine tolled the statute of limitations. *Id.* The district court found that no reasonable jury could conclude that the farmers had exercised reasonable diligence in ascertaining the cause of their injury. *Id.* On appeal, the Third Circuit reversed, ruling that a reasonable jury could find that the farmers had diligently investigated the cause of their cows' symptoms and had reasonably relied on expert reports specifically ruling out fluorosis as the cause. *Id.* at 512.

■ Unlike in *Mest*, a reasonable jury could not find that Miller exercised reasonable diligence in ascertaining the cause of its injury. Upon learning of their cows' symptoms, the farmers in *Mest* swiftly hired agricultural experts, contacted environmental regulatory agencies, and retained university scientists to study their farms. *Id.* at 508–509. In contrast, Miller knew of its injury in 1991 when it lost the business of Dofasco and Stelco, but Miller failed to undertake any serious investigation into the origins of the product that had lured away two valuable customers. By February 1991, Miller had learned from Dofasco that it had started buying Carr's acid inhibitor. Miller also hired a salesman, Stephen Dale, to replace Carr and gave him the task of finding out what acid inhibitor Stelco was buying. Dale learned that Stelco was also buying Carr's acid inhibitor. When Miller learned that its former customers were buying an inhibitor from Carr, Miller's sales manager and chemist wondered amongst themselves how Carr could have obtained an inhibitor in just a month. They developed suspicions that Carr had stolen the formula. Miller's president and then-sales manager, Bruce Entwisle, was "alarmed" by the loss of business from Stelco and Dofasco. He inquired whether Stelco or Dofasco knew the identity of Carr's manufacturer. Dofasco's employee could not remember when asked, and Stelco's employee was "evasive" and told Miller it was none of Miller's business. Mr. Entwisle stated that he believed Dofasco's employee was lying about not remembering the name of Carr's manufacturer, but Mr. Entwisle failed to ask anyone else at Dofasco whether they had the information he wanted. Similarly, when met with Stelco's curt response, Entwisle simply dropped the issue. No one at Miller ever confronted Carr. Instead, Miller remained content with its own ignorance.

Miller developed no serious strategy to investigate the origins of Can–Hib because it admittedly did not care where Carr's product came from or who was making it for him. Miller's chief chemist, Mr. Nick Ariano, testified that Miller obtained samples of Carr's product in order to assess the performance of Carr's inhibitor in order to better understand the success of Carr's sales strategy.[9] Mr. Ariano was unable to offer any information about how performance testing would have helped Miller determine the source of Carr's formula. ("We didn't have any discussions at

---

9. Courts consider the "ease or difficulty with which information could be properly acquired or duplicated by others" when determining whether information is a trade secret. *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa.Super.1997). Therefore, information is not a trade secret if it can be reverse-engineered. If such testing by Miller *did* reveal the formula of Can–Hib, and Can–Hib was "identical" to Activol, this would be tantamount to an admission that Activol could be reverse-engineered.

that point as to what direction we were going to take to try and find out where Carr's inhibitor came from."). Upper level management also failed to treat Carr's inhibitor as a threat requiring an urgent response. Mr. Entwisle admitted that he was not sure whether investigating the origins of Can–Hib was a priority when he assumed presidency of the company because he dealt with issues "in the order they were presented." Mr. Entwisle further testified that Miller "didn't care who was making [Can–Hib]" because they knew Carr "wasn't making it." Miller's admitted disinterest in ascertaining the source of its injury dramatically fails to satisfy the requirements under Pennsylvania law that a plaintiff investigating his injury exhibit the "attention, knowledge, intelligence and judgment" society expects. *Mest*, 449 F.3d at 511.

Miller defends its failure to pursue Carr or any of Carr's potential associates on the basis that it "could not" confirm the source of Carr's product, its ability to recapture the lost business, and Carr's personal ability to pay a monetary judgment for stealing Miller's formula. However, Miller confuses existing uncertainty with an inability to know. An injured party faced with uncertainty must make some effort to discover facts relating to his injury before he gives up his investigation. *Mest*, 449 F.3d at 511. The farmers in *Mest*, for example, faced uncertainty regarding the cause of their cows' symptoms. 449 F.3d at 508–509. They did not initially know if the cause of the problem was environmental, or farm-specific. *Id.* To resolve their uncertainty, they expended time and resources consulting everyone they could find who might assist them. *Id.* They hired experts, called the government, and paid university scientists to conduct tests. *Id.* In contrast, Miller used its uncertainty as an excuse for inaction. Miller conducted no serious investigation into the origins

of Can–Hib and never sought the help of anyone to resolve its uncertainty—it never confronted Carr prior to the Carr litigation, and it never hired any experts or private investigators. Miller argues that its uncertainty about Carr's ability to pay a judgment induced Miller not to pursue its suspicions, but Miller cites no authority for the proposition that a potential defendant's meager net worth excuses the obligation of reasonable diligence and tolls the statute of limitations. Ultimately, Miller admits that its failure to sue Paul Carr prior to 1997 was a deliberate choice, a "rational business decision"—not the product of Miller "inability" to know the nature of its injury or the cause of its injury. The facts demonstrate that Miller made no serious effort to protect its rights.

Finally, Miller contends it had no reason to suspect that Mancuso had assisted Carr in his alleged misappropriation because no one ever mentioned Mancuso in the numerous sales calls Miller made. This argument ignores the record evidence and Miller's obligation to exercise reasonable diligence. For example, Stelco told Miller that it did not trust Carr's manufacturer, but Miller did not ask Stelco the identity of that manufacturer or why Stelco considered the manufacturer untrustworthy. Another customer, CVL Rubber Products, told Miller that Carr's product was manufactured in Niagara Falls, but Miller never tried to determine what chemical companies were based in Niagara Falls, New York, or Niagara Falls, Ontario. Even when Stelco told Miller prior to March 11, 1996 that Mancuso was making Can–Hib, the product based on the allegedly stolen formula, Miller maintains it was reasonable to assume Mancuso was an "innocent blender." It was not the world's burden to unearth facts relating to Mancuso's identity, its relationship with Carr, and its role in profiting from the allegedly stolen for-

mula. That burden was Miller's. Because Miller did not even try to find out about Mancuso, Miller cannot contend it was *unable* to know about Mancuso, despite the exercise of reasonable diligence. *Mest*, 449 F.3d at 511. Given the limited scope of the discovery rule and ample evidence that Miller took a dilatory and disinterested approach to protecting its rights, the discovery rule does not apply. A reasonable jury could not find otherwise.

### b) Fraudulent concealment

■ Miller also contends that Mancuso fraudulently concealed its role in the misappropriation of Miller's trade secret, such that Miller could not have known the cause of its injury in the early 1990s. The fraudulent concealment doctrine tolls the statute of limitations where " 'through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from the right of inquiry.' " *Mest*, 449 F.3d at 516 (quoting *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir.1985)). The defendant must commit an " 'affirmative and independent act of concealment that would divert or mislead the plaintiff....' " *Id.* at 517 (quoting *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir.1991)).

■ In *Mest*, the Third Circuit found the fraudulent concealment doctrine applicable where the defendant factory owner, Cabot, had assured a subset of the plaintiff farmers that the factory was not causing the cows' symptoms. *Id.* at 516. The Court determined that reasonable minds could disagree about whether Cabot's assurances had caused the plaintiffs to reasonably believe that fluoride was not causing their problems. *Id.* The Court found the doctrine inapplicable to certain other farmers' claims where Cabot had never communicated directly with those farmers. 449 F.3d at 517. As such, Cabot had no

opportunity to mislead those farmers with any " 'affirmative and independent act of concealment.' " *Id.* Similarly, the fraudulent concealment doctrine does not apply to Miller's case because Mancuso never communicated directly with Miller or took any affirmative steps that would mislead Miller. There is no evidence that anyone at Mancuso ever spoke to anyone at Miller prior to the Carr litigation or had any opportunity to make misleading remarks. The record shows no evidence that Mancuso ever denied it was involved in the manufacturing of Can–Hib.

Miller contends that several contemporaneous documents issued by Carr or Mancuso concealed Mancuso's specific role in the alleged misappropriation. These documents include a Material Safety Data Sheet for Can–Hib listing Carr Chem as the manufacturer, Carr Chem letterhead describing Carr Chem as a manufacturer and distributor, and the manner in which Carr Chem invoiced customers (with customers paying Carr Chem, and Carr Chem then paying Mancuso). These documents, Miller contends, indicate that Carr Chem owned Can–Hib, and that Mancuso functioned merely as a blender with no proprietary rights over the formula. Miller further contends that the documents demonstrate that Mancuso and Carr conspired to conceal the true nature of their relationship.

Miller basically argues that it could not know of its injury caused by Mancuso because Mancuso never asserted proprietary rights in the Can–Hib formula prior to 1998. But this assumes that Mancuso's assertion of ownership of the formula is an essential element for liability for misappropriation of a trade secret. This is incorrect. Under Pennsylvania law, a claim for misappropriation of a trade secret does not require a showing that the defendant claimed to own the trade secret. *Rohm &*

*Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429–430 (3d Cir.1982). Therefore, if Can–Hib was wrongfully derived from Activol, and Mancuso knew this and persisted in using the formula anyway, Mancuso would be liable for misappropriation regardless of whether it served as a blender, the manufacturer, or the purported owner of Can–Hib.[10] Thus, even if the documents Miller cites labeled Mancuso a "blender" and not an owner or manufacturer, none of those documents "concealed" Mancuso's potential liability for misappropriation or its role in causing Miller's injury. Most importantly, the documents Miller considers misleading were produced in the Carr litigation, and not before. Pl.'s Opp. at 6. Miller could not have been misled by these documents in the early 1990s if it did not see them until the late 1990s. For the reasons discussed above, Miller should have known of its potential claim against Mancuso as early as 1991, and the fraudulent concealment exception does not apply.

## C. *Continuing Tort*

■ Miller's claim, however, is not totally precluded. Under Pennsylvania law, misappropriation of a trade secret is a "continuing tort." If a tort is continuing, with every wrongful act, "the statute of limitations commences to run anew...." *Anaconda v. Metric Tool & Die Co.*, 485 F.Supp. 410, 426 (E.D.Pa.1980) (Becker, J.), *declined to follow on other grounds by, Santana Products, Inc. v. Bobrick Wash-*

*room Equipment*, 401 F.3d 123 (3d Cir. 2005).[11] *Frank W. Winne and Son, Inc. v. Palmer*, 91–2239, 1991 WL 155819, *4–5, 1991 U.S. Dist. LEXIS 11183, *13 (E.D.Pa. Aug. 7, 1991) (Waldman, J.) (misappropriation a continuing tort under Pennsylvania law).[12] Thus, each time Mancuso uses Miller's allegedly stolen formula, the statute of limitations begins to run, giving Miller a new two year period in which to file suit.

■ Mancuso continues to manufacture Can–Hib to this day, albeit under the name "Man–Hib." Therefore, the effect of the statute of limitations is not to bar the claim completely, but "to limit plaintiff's recovery to damages sustained by reason of the defendant's unauthorized use of the trade secret during the statutory [ ] period preceding the filing of the suit." *Id.; cf. Gloster v. Relios, Inc.*, 02–CV–7140, 2006 WL 1737800, n. 1 (E.D.Pa. June 26, 2006) (Pollak, J.) (in case of continuing trademark infringement, plaintiff's recovery limited to infringement that occurred during the statutory period). According to this rule, Miller is barred from recovering for damages for any misappropriation occurring prior to May 24, 1997, or two years before it filed this lawsuit. Damages are available, however, for Mancuso's wrongful use of its formula on or after May 24, 1997. In sum, Miller's claim for misappropriation of trade secret is barred for the period preceding May 24, 1997, but Miller's claim survives for the period beginning on or after May 24, 1997.

---

10. This assumes that all the other elements of the claim are met.

11. This rule flows from the concept that a plaintiff's intellectual property rights are violated with each wrongful use of a trade secret. *Anaconda*, 485 F.Supp. at 426.

12. Pennsylvania adopted portions the Uniform Trade Secrets Act in 2004, but the statute does not apply to Miller's claims, which

accrued prior to that time. 12 Pa.C.S.A. § 5301, *et. seq.* The statute specifically refers to the concept of a continuing misappropriation: "This act shall not apply to misappropriation occurring prior to the effective date of this act, *including a continuing misappropriation that began prior to the effective date of this act and which continues to occur after the effective date of this act.*" (Sec. 4 of 2004, Feb. 19, P.L. 143, No. 14) (emphasis added).

## V. *Conspiracy to Misappropriate a Trade Secret*

Miller alleges that Mancuso conspired with Paul Carr to misappropriate the formula for Activol. Am. Compl., ¶ 71.

### A. *Substantive Claim*

■ A civil conspiracy is "a combination of two or more persons acting with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979). Proof of malice, or intent to injure, is essential. *Id.* Because there is sufficient evidence on record that Carr and Mancuso, with an intent to injure, agreed to misappropriate Miller's trade secret, defendant's motion for summary judgment on this claim was denied.

### B. *Statute of Limitations*

#### 1. *Statutory period*

■ Mancuso contends that the statute of limitations serves as an independent bar to Miller's conspiracy claim. The statute of limitations for civil conspiracy is identical to the statute of limitations for the underlying substantive offense, which in this case is misappropriation of a trade secret. *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir.1974). Therefore, the statutory period is two years. *See* 42 Pa. Cons.Stat. § 5524(7); *Highland Tank & Mfg. Co. v. PS Int'l, Inc.,* 393 F.Supp.2d 348, 354 (W.D.Pa.2005). A cause of action for conspiracy accrues with each overt act causing damage. *Ammlung,* 494 F.2d at 814–15 (citing *Auld v. Mobay Chem. Co.,* 300 F.Supp. 138 (W.D.Pa.1969)) (applying Pennsylvania law). In a conspiracy to misappropriate a trade secret, each act of misappropriation (i.e., each wrongful use of the misappropriated trade secret) constitutes an overt act. Thus, each use of Miller's trade secret creates a new two year period in which Miller may file suit. There is evidence that in 1997, during the Carr litigation, Carr and Mancuso continued selling and making Can–Hib together.[13]

A plaintiff may seek redress, however, only for those overt acts that occurred during the statutory period. " 'For each act causing injury, a claimant must seek redress within the prescribed limitations period. Such a rule is consistent with the distinction between civil and criminal conspiracies. In the civil case, actual injury is the focus point, not the illegal agreement per se . . . .' " *Kost v. Kozakiewicz,* 1 F.3d 176, 191 (3d Cir.1993) (quoting *Wells v. Rockefeller,* 728 F.2d 209, 217 (3d Cir. 1984)). According to this rule, Miller is entitled to seek relief only for those injurious overt acts that occurred on or after May 24, 1997. *Auld,* 300 F.Supp. at 142. Any overt acts predating May 24, 1997 are no longer actionable. Thus, summary judgment was granted on Miller's claim predating May 24, 1997. Summary judgment was denied with respect to Miller's claim on or after May 24, 1997.

#### 2. *Tolling*

Miller could have discovered in 1991, through the exercise of reasonable diligence, that Carr and Mancuso had agreed to manufacture an acid inhibitor derived from Miller's formula. For the reasons already discussed, the statute of limitations is not tolled due to the discovery rule or fraudulent concealment.

---

**13.** This alleged conspiracy may or may not have ended in 1999 when the Carr litigation settled.

## VI. *Unjust enrichment*

Miller contends that Mancuso has been unjustly enriched by use of Miller's trade secret. Am. Compl. ¶ 82.

### A. *Substantive Claim*

 The elements of unjust enrichment are: (1) benefits conferred upon defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.1999). A claim for unjust enrichment does not require showing that defendant harbored any wrongful intent. *Id.* I decline to decide the question of whether Miller's claim withstands summary judgment on the merits, because I find that the claim is time-barred.

### B. *Statute of limitations*

#### 1. *Statutory period*

 The statute of limitations for unjust enrichment is four years. 42 Pa. Cons.Stat. § 5524(4); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa.Super.1997). A claim for unjust enrichment accrues when the defendant "receives and retains benefits." *Konidaris v. Portnoff Law Associates, Ltd.*, 884 A.2d 348, 355 (Pa.Cmwlth. 2005). Because unjust enrichment does not require wrongful intent, the claim accrues whether or not Mancuso knew the formula for Can–Hib had been stolen. Therefore, Miller's claim for unjust enrichment accrued in 1991 when Mancuso began profiting from sales of Can–Hib, and the statutory period ended in 1995. Miller

did not sue until 1999, or four years after the end of the statutory period. Therefore, Miller's claim is time-barred.

#### 2. *Tolling*

As early as 1991, Miller could have determined that Mancuso, as Carr's business associate, was profiting from the stolen formula. Miller could have learned, therefore, that Mancuso had "receive[d] and retaine[d] a benefit"—whether or not Mancuso was an innocent blender or a co-conspirator fully aware of the origins of the Can–Hib formula. *Konidaris*, 884 A.2d at 355. For the reasons already discussed, the discovery rule and fraudulent concealment doctrine do not apply.[14]

## VII. *Tortious Interference with Prospective Contract*

Miller alleges that Mancuso tortiously interfered with a prospective contract with Dofasco in 1999. After the Carr settlement, Carr assigned to Miller his rights, if any, in Can–Hib. Miller then demanded that Mancuso cease and desist its manufacture of Can–Hib. Instead, Mancuso told Dofasco that it owned the formula for Can–Hib, and that it would continue to sell the product to Dofasco under the name "Man–Hib." According to Miller, this act of selling Man–Hib to Dofasco after the settlement constitutes tortious interference with Miller's prospective contract to sell Activol to Dofasco.

### A. *Substantive Claim*

 To withstand summary judgment on a claim for tortious interference with prospective contract, Miller must demon-

---

**14.** Neither party contends that unjust enrichment is a "continuing tort." The continuing tort theory is inapplicable because Miller's unjust enrichment claim is freestanding and not dependent on proving misappropriation of the formula by Mancuso. Thus, the "continuing tort" theory of misappropriation of a trade secret is not relevant to analysis of Miller's unjust enrichment claim.

strate the existence of a genuine issue of material fact as to the following elements: "(1) a prospective contractual relation; (2) purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on the part of the defendant; (4) occasioning of actual damage resulting from the defendant's conduct." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 925 (3d Cir.1990). A "prospective contractual relationship" is " 'something less than a contractual right, something more than a mere hope.' " *Id.* (quoting *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466 (1979)).

■ The Third Circuit interprets Pennsylvania law to require a plaintiff to demonstrate "an objectively reasonable probability that a contract will come into existence." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 184 (3d Cir.1997). This "reasonable probability" may result from an unenforceable express agreement, an offer, or the parties' current dealings. *Allstate Transp. Co., Inc. v. Southeastern Penn. Transp. Auth.*, No. 97–1482, 1997 WL 666178, *11 (E.D.Pa. Oct.20, 1997). Prior dealings or an existing business relationship between the parties do not create a reasonable probability. *Id.* ("Under Pennsylvania law, merely pointing to an existing business relationship or past dealings does not reach this level of probability.")

■ A reasonable jury could not find that Miller had any objective basis for expecting to resume contractual relations with Dofasco after the Carr settlement. Miller has offered no facts to suggest that Dofasco had made an offer to Miller, had entered into an unenforceable express agreement, or that Miller and Dofasco had *any* "current dealings" at the time of Mancuso's alleged tortious interference. *Allstate Transp. Co.*, 1997 WL 666178, *11 (E.D.Pa. Oct.20, 1997). Dofasco's prior business relationship with Miller, which had ended 8 years earlier, also does not provide Miller a reasonable basis for expecting Dofasco to purchase Activol. *Id.* Dofasco terminated contractual relations with Miller in 1991 because it perceived problems with Miller's product and Miller failed to provide a remedy. Miller cannot reasonably maintain that it expected Dofasco to purchase Activol solely because of a prior business relationship that Dofasco had terminated for cause.

Miller also fails to offer sufficient evidence that Dofasco ever contemplated entering into a contract with Miller in 1999, but for Mancuso's "tortious" conduct.[15] Miller points to tests conducted

---

**15.** In *General Sound Telephone Co., Inc. v. AT & T Commun, Inc.*, the Court found no reasonable probability of a contract even where the prospective contractee stated that defendant's tortious conduct prevented it from soliciting a bid from the plaintiff. 654 F.Supp. 1562 (E.D.Pa.1987) (Troutman, J.). Plaintiff was a telecommunications equipment provider, General Sound Telephone ("GST"), that had entered into a contract with a firm called Lawrence Schiff Silk Mills ("LSSM"). *Id.* GST recommended that LSSM upgrade the phone lines between the firm's offices in Quakertown, Pennsylvania, and New York City by disconnecting the existing circuits and replacing them with a different type of circuit. *Id.* at 1563. GST placed an order with defendant, ATTCOM, which managed interstate long distance telephone services. *Id.* Despite repeated requests by GST to complete the work, ATTCOM never upgraded the system. *Id.* at 1563–64. LSSM subsequently decided to purchase for its New York office an alternate phone system from ATTIS, an AT & T subsidiary that sells telecommunications equipment. *Id.* at 1564. LSSM did not solicit any bids from any other companies. *Id.* GST alleged that defendants ATTCOM and ATTIS had tortiously interfered with its prospective contractual relationship with LSSM relating to LSSM's purchase of a phone system for its New York office. GST contended that its contract for the Quakertown office's

by Dofasco in 1996 showing that Activol outperformed Can–Hib. Dofasco never performed a full battery of trials to substantiate that conclusion. Don McMillan, Dofasco's senior purchasing agent, testified that Dofasco often does not commit to purchasing any of the tested products even after conducting a trial. Miller had no basis to believe that a favorable preliminary test conducted in 1996 would lead Dofasco to enter into a contract to purchase Activol in 1999, absent Mancuso's continuing sales of Can–Hib. Miller also ignores that the acid inhibitor landscape had changed by 1999 to further lessen the chance of a contract with Dofasco. Robert Julien, Dofasco's purchasing agent, testified that the acid inhibitor options for steel companies had grown: Crown Technology had become one of the largest suppliers of acid inhibitor product in Canada, and Dofasco was ready to purchase an inhibitor from Crown if Can–Hib and Activol were unavailable. As one of several acid inhibitor companies to whom Dofasco could turn, Miller had no objective basis for its claim that Dofasco had "no option" but to turn to Miller, absent Mancuso's continuing sales of Man–Hib. Pl.'s Sur-reply at 3.

Miller contends that it reasonably believed that Dofasco would enter into a contract with Miller because Miller was the only supplier of the product Dofasco "had been buying for fifteen years," first from Miller in the form of Activol, then from Carr Chem and Mancuso in the form of Can–Hib. Pl.'s Sur-reply at 3. The evidence, however, undermines the notion that Dofasco viewed Activol and Can–Hib as the "same" or interchangeable.[16] As discussed above, Dofasco terminated its relationship with Miller in 1991 for cause, and Dofasco's blind trials demonstrated that Can–Hib performed better. In light of Dofasco's belief that Activol performed worse than Can–Hib, a jury could not reasonably infer that Dofasco considered Can–Hib to be the "same" product Miller had supplied it from 1984 to 1990.

Miller also contends that it had "begun negotiations" with Dofasco, but the only evidence it offers is an overture from Bruce Entwisle notifying Dofasco that Miller was "ready" to provide Dofasco with an acid inhibitor. One-sided expressions of interest do not qualify as "negotiations." Miller points to a letter sent by Mancuso's counsel as evidence that Mancuso feared that Miller would obtain a contract with Dofasco. The letter, however, demonstrates only that Mancuso objected to Miller's (one-sided) communication with Dofasco, in which Miller asserted that Miller could provide Dofasco with the "same" inhibitor previously distributed by Carr Chem, Inc. The letter sets forth Mancuso's position, maintained throughout this litigation, that Carr had no proprietary rights in Can–Hib at the time of the Carr settlement. Accordingly, Carr could not have assigned those rights to Miller. None of

---

phone system created a reasonable likelihood of obtaining a contract for the New York office's phone system. *Id.* at 1565. GST submitted an affidavit by LSSM's president stating that the problems LSSM experienced with the interoffice phone lines caused him not to consider soliciting a bid from GST for the New York office's phone system. The Court found it significant that the president of LSSM did not state that LSSM might have purchased GST's phone system. The Court determined that GST could not prevail relying on such evidence because the evidence did not demonstrate a sufficient likelihood of obtaining the specific contract at issue. At most, GST had demonstrated that it had lost an opportunity to be *considered* for a contract.

16. The performance of the two products is a different issue from their composition.

Miller's evidence supports anything more than a mere hope for a contract.

For the reasons discussed above, summary judgment was granted on Miller's claim for tortious interference with a prospective contract.

## B. *Statute of limitations*

Because this claim was dismissed on the merits, I do not reach the question of whether the claim was timely filed.

## VIII. *Breach of contract*

Miller argues that the confidentiality agreement between Carr Chem and Mancuso constitutes a binding contract on the parties and their successors. Pursuant to the Carr litigation settlement agreement, Carr assigned all his rights in Can–Hib, if any, to Miller. As Carr's assignee, Miller attempted to enforce the terms of the Carr Chem–Mancuso confidentiality agreement by demanding that Mancuso cease and desist its manufacture of Can–Hib. Mancuso's refusal to cease and desist, Miller contends, constitutes a breach of contract.

### A. *Substantive Claim*

■ To withstand summary judgment on a claim for breach of contract, Miller must demonstrate the existence of a genuine issue of material fact regarding the following elements: (1) existence of a binding contract; (2) breach of a duty imposed by the contract; and (3) damages. *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa.Super.2000).

Mancuso disputes Miller's ability to prevail on any element of Miller's breach of contract claim. I do not address the question of whether the agreement constitutes a valid, binding contract between Carr Chem, Inc. and Mancuso, because Miller has failed to demonstrate a genuine issue of material fact as to whether Mancuso breached any duty under the contract.

Miller's claim for breach of contract makes no sense if any misappropriation of its trade secret occurred. If Carr's formula had been stolen from Miller, Miller would already own the formula, and Carr would have no proprietary rights to assign to Miller.[17] Miller's breach of contract claim, therefore, presupposes that Carr rightfully obtained a formula, that he had entered into a confidentiality agreement with Mancuso, and that he assigned all of his rights in his formula to Miller.

The confidentiality agreement is of limited scope. It governs Mancuso's use of information relating to Carr Chem's products. It obligates Mancuso to keep all information confidential, not to use or disclose any confidential information, to use information only for the purpose of blending Can–Hib unless it obtains written consent of Carr Chem, and to disclose information to employees and officers only on a "need to know" basis. It further establishes that all information is the property of Carr Chem, and that Mancuso does not gain a right or interest to any information disclosed to it. The agreement also establishes that Carr Chem will designate information it considers confidential with the notation "Confidential."

None of the conduct Miller alleges violates any provision of the contract. Miller contends that, "Mancuso has breached its

---

**17.** In recognition of this point, Miller pleads its claim for breach of contract in the alternative; if the jury finds in Miller's favor on its misappropriation of a trade secret claim, its breach of contract would be moot. Plaintiff's Sur-reply, p. 24. *Crawford Cent. Sch. Dist. v. Pennsylvania*, 585 Pa. 131, 888 A.2d 616, 619–620 (2005) ("Under the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor.") (citations omitted).

duty to maintain the confidentiality of all technical information and know-how provided to it by Carr Chem, and to use that information solely for the purpose of blending Can–Hib, by refusing to cease and desist the manufacture and sale of acid inhibitor after March 1999." Pl.'s Opp., p. 14. Miller offers no evidence for any of these contentions. First, Miller fails to establish that Carr ever designated any information "confidential." The contract provides that any written disclosures of information that Carr Chem considers "confidential" "shall bear the notation 'Confidential.'" Carr Chem's designation of information as confidential is, therefore, a condition precedent to Mancuso's obligation to keep information about Can–Hib confidential. Miller points to no evidence that Carr Chem satisfied this condition precedent. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1007 ("The generally accepted rule is that the burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise."). Without evidence that Carr Chem fulfilled this condition, a jury could not reasonably find that Mancuso's duty ever arose.[18]

Second, Miller contends that Mancuso breached its duty not to use information about Can–Hib for a purpose other than blending Can–Hib, unless it obtained the written consent of Carr Chem. Without any evidence that any information was designated "Confidential," however, the information is *not confidential.* If the information is not confidential, Mancuso is free to disclose the information. If Mancuso is free to disclose the information to outsiders, it stands to reason that Mancuso may use the information as it sees fit.

Third, Miller points to Mancuso's communication with Dofasco, in which Mancuso stated that it owned the formula for Can–Hib, as a self-evident violation of the confidentiality agreement. Mancuso's conduct, however, is not inconsistent with the terms of the confidentiality agreement. Although the agreement establishes that Mancuso has no proprietary rights in Can–Hib, the agreement does not prohibit Mancuso from telling Dofasco anything. Accordingly, Miller's claim fails and summary judgment was granted.

## IX. *Laches*

■ Defendants moved for summary judgment on Counts I (misappropriation of a trade secret), IV (conspiracy to misappropriate a trade secret), V (tortious interference with a prospective contract) and VIII (unjust enrichment) on the basis of laches. The determination of whether laches apply to bar a claim for equitable relief requires close scrutiny of the facts. To demonstrate the existence of laches, a defendant must show that the plaintiff inexcusably delayed in filing suit and that the defendant suffered prejudice as a result. Where the plaintiff files suit after the limitations period, laches are presumed, and a plaintiff must disprove both elements. Because the only claims that remain are those that were filed within the applicable statutory period, Mancuso will bear the burden to show that laches applies.

## X. *Conclusion*

For the reasons set forth above, the parties' motions for summary judgment

---

**18.** Miller contends that the only relevant evidence for this claim, namely formula sheets for Can–Hib, has been destroyed.

were resolved as indicated in the order dated January 3, 2007 (Doc. # 362).